UNTERBERG HARRIS PRIVATE EQUITY PARTNERS, L.P., Unterberg Harris Private Equity Partners, C.V., Unterberg Harris Interactive Media Limited Partnership, C.V., Unterberg Harris LLC, Unterberg Harris 401K Profit Sharing Plan FBO Jody A. Owen 401K, Park City Investments, Wendy Lavitt, John Dexheimer, Andrew G. Celli, Jr. and James E. Satloff Trustees u/a/d 5/19/93 FBO Rebecca Rose Celli and u/a/d 5/19/93 FBO Dustin Nathanial Satloff, Ellen Unterberg Celli, Andrew Kessler, Individually and as Custodian for Kyle Jacob Kessler and for Kurt David Kessler, Unterberg Harris 401K Profit Sharing Plan FBO Andrew Arno 401K, Thomas I. Unterberg and Robert C. Harris, Jr., Plaintiffs,

v.

XEROX CORPORATION, Xerox Venture Capital (a Division of Xerox Corporation), Donald E. Riley, Leroy W. Haythorn and Microlytics, Inc., Defendants.

No. 96 Civ. 7645 (RWS).

United States District Court, S.D. New York.

March 3, 1998.

Solovay Marshall & Edlin, New York City (Richard A. Edlin, Stephen L. Weinstein, Cheryl A. Mitchell, of counsel), for Plaintiffs.

Nixon, Hargrave, Devans & Doyle, New York City (Robert C. Sentner, Kermitt J. Brooks, of counsel), for Defendants Xerox Corp., Xerox Venture Capital and Donald E. Riley.

## OPINION

SWEET, District Judge.

Defendants Xerox Corporation, Xerox Venture Capital, ("Xerox"), Donald E. Riley, ("Riley"), Leroy W. Haythorn ("Haythorn"), and Microlytics, Inc., ("Microlytics") (collectively, "Defendants") move for summary

judgment pursuant to Rule 56, Fed.R.Civ.P., in this securities fraud action filed by plaintiff Unterberg Harris Private Equity Partners, L.P., ("Unterberg"). For the reasons set forth below, Defendants' motion is hereby granted.

### Parties

Unterberg is formed of a group of limited partnerships specializing in investing with principal places of business in New York and the Netherlands Antilles.

Xerox is a technology firm incorporated in the State of New York.

Microlytics is a now-bankrupt software start-up company funded in large part in the beginning of its existence by Xerox.

Riley, a former executive at Xerox, acted as Xerox's liaison to Microlytics and served on the Board of Microlytics from 1990 until June 19, 1995.

Haythorn, a former Xerox employee for 28 years, was Microlytics' CEO and Chairman from 1993 until February 1996.

### Prior Proceedings

Unterberg filed the complaint in this action on October 8, 1996, asserting claims under Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934, (the "Act"), 15 U.S.C. § 78j(b), Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, ("Rule 10b–5"), Section 20 of the Act, as well as common law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, breach of contract, and civil conspiracy. The action claim arose out of the business failure of Microlytics, of which Unterberg purchased 32.5 million shares in June 1995.

On November 24, 1997, Defendants filed the instant motion for summary judgment. Oral argument was heard on December 17, 1997, at which time the motion was deemed fully submitted.

### Facts

In June 1995, Unterberg invested $2.55 million in Microlytics, a company engaged in software research, development and marketing, which was backed by Xerox. Microlytics was founded in 1985 primarily as a software firm. Xerox gave Microlytics approximately $9 million over the first ten years of its existence as part of a larger project to fund small start-up companies whose orientation towards high technology fell outside of the usual business description of Xerox. In part to help the fledgling company grow and in part to keep an eye on its investment, Xerox placed Riley, a long-time Xerox employee, on Microlytics' Board in 1990. In June 1995, Riley resigned from Xerox, and thus from Microlytics' Board, and rejoined Microlytics' Board as an individual in July of 1995. Xerox also recommended that Haythorn, another long-time Xerox employee, take over as CEO and Chairman of Microlytics in 1993.

Prior to his appointment at Microlytics, Haythorn struggled with a gambling addiction. By 1991, he had accumulated more than $1 million in gambling debts. In 1992, Haythorn was forced to file for personal bankruptcy. According to Xerox, Haythorn's gambling addiction did not come to Xerox's attention until 1994, when Haythorn's estranged wife brought an ERISA action against Xerox for improperly denying her spousal benefits when it made a lump sum payment to Haythorn on his early retirement from Xerox. Because Haythorn's wife alleged that someone had forged her signature on a waiver of spousal benefits, Xerox brought a third party complaint against Haythorn for defrauding Xerox as to the signature. In his defense, Haythorn admitted that he had been disabled by a compulsive addiction to gambling. Haythorn had also taken several loans from Microlytics with Riley's approval, but without Board approval, and without record in Microlytics' books. Despite the lawsuit and Haythorn's admitted gambling problem in 1991, Haythorn remained CEO and Chairman of Microlytics.

By 1994, Microlytics had dedicated itself to developing and marketing a software program that would create a telephone directory on CD and on computer disc, thus catering to a specific niche in an uncertain market. Microlytics needed to attract additional investor capital to keep the company afloat until it could attract the relevant buyers.

During the first part of 1995, negotiations commenced between Microlytics and Unterberg concerning a potential purchase of Microlytics stock. In May 1995, Robert C.

Harris, Jr. ("Harris"), managing partner of Unterberg, called Riley to discuss investment in Microlytics. According to Unterberg, Riley told Harris that Xerox stood behind Microlytics, had confidence in Haythorn and the Microlytics management team, and that there was nothing about Microlytics which Unterberg had not asked about and needed to know.[1] Unterberg does not assert that Xerox concealed the degree of risk involved in investing in Microlytics. Unterberg was aware that low levels of working capital regularly threatened financial crisis at Microlytics, that in October 1991 Microlytics common stock had lost its Nasdaq listing for failing to meet minimum net worth requirements, and that in the last quarter of calendar 1993, Microlytics missed its scheduled interest payments on debentures.

In part because Unterberg was satisfied by the conversation with Riley and also in part because of other investigations, Unterberg bought $2.55 million worth of Microlytics stock in June 1995, at $.08/share. At the time of the sale, Harris joined Microlytics' Board. Unterberg also signed a consulting contract with Microlytics through which Unterberg agreed to help attract investor capital for the company.

Twice during the Fall of 1995, in September and in October, Unterberg sent out prospectuses to potential investors endorsing Microlytics as a "speculative buy" for high-risk accounts. In promoting Microlytics' stock, Unterberg indicated that Microlytics was providing services to an undeveloped market and that the market might not develop within the expected time frame.

As set forth above, at the time of Unterberg's investment in July of 1995, Microlytics' stock was trading at $.08/share. That value rose to $.19/share in December 1995, then dropped to $.12/share in January 1996. By February of 1996, Microlytics' stock was trading at $.10/share. From the December peak until Microlytics declared bankruptcy, the stock value steadily declined.

On February 12, 1996, an article appeared in the *Democrat & Chronicle,* a Rochester, New York newspaper, (the "Article"), de-scribing the lawsuit brought by Haythorn's wife, which was still in court. The Article alluded to Haythorn's 1991 gambling addiction. Harris, learning for the first time about Haythorn's history of gambling, confronted Haythorn. According to Harris, Haythorn told him that he still suffered from the addiction. Harris, concurring with the rest of the Board, asked for Haythorn's prompt resignation because he feared for Haythorn's ability to lead the company, doubted his moral integrity, and was concerned that the public knowledge of the gambling addiction might damage Microlytics' ability to attract investor funds.

After Haythorn resigned, Harris became chairman of Microlytics. Unterberg asserts that the abrupt change in leadership threw Microlytics into disarray and deprived it of the leadership and marketing skills it needed to attract additional capital.

In April 1996, two months after Haythorn's departure, Microlytics' stock was valued at $.065/share. Unterberg again sent out a prospectus to potential investors that explained that Microlytics' revenue was only down because of "lack of immediate revenue available from the product line" and lack of investor cash. Also in April, the Microlytics management team began actively pursuing a sale of the company. Negotiations were commenced with Inso, a publicly held information technology company, which was prepared to offer assumption of control of the company's assets free of all liabilities. According to Unterberg, substantial progress was made in the negotiations until Xerox refused to confirm that Inso would be able to use the Xerox technology licensed to Microlytics, as a result of which refusal, Inso abruptly withdrew. According to Inso, it lost interest when it determined that Microlytics did not have a sufficient "pipeline of pending business." After the Inso deal fell apart, Microlytics' stock fell to $.025/share. Xerox's withdrawal of support and refusal to confirm the continued licensing of its technology made it clear to Harris that any further attempt to sell the company would be futile,

---

1. According to Xerox, Riley was never asked for any information regarding Haythorn or his capabilities as a manager of Microlytics. Rather, Unterberg's inquiry focused on whether Xerox stood behind and had genuine confidence in Microlytics prospects.

and he resigned from the Board on July 8, 1996. Microlytics filed for bankruptcy in November 1996.

### Discussion

### I. Legal Standards

#### Summary Judgment

 The standard for summary judgment is well defined. "Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a general rule, all ambiguities and inferences drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. However, "where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991) (citations and internal quotation omitted). Moreover:

> When a defendant has moved for summary judgment on the ground that undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element, summary judgment should be granted.

*Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In sum, if in "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); See also *Bay*, 936 F.2d at 116.

#### Section 10b–5 Standard

 In order to prevail on a Section 10b–5 claim, a plaintiff must allege: 1) material misstatements or omissions; 2) indicating an intent to deceive or defraud; 3) in connection with the purchase or sale of a security; 4) upon which the plaintiffs reasonably and detrimentally relied. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). In addition, plaintiffs must also show both transaction causation and loss causation. *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation*, 850 F.Supp. 1105, 1114 (S.D.N.Y.1993). "In other words, the plaintiff must show that the defendant's misrepresentations not only caused the plaintiff to engage in the transaction in question, but also that they caused the harm suffered." *Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (per curiam); *see also, Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 85 (2d Cir.1988) ("loss causation" means that the "misrepresentation or omission caused the economic harm"), *rev'd on other grounds sub nom, Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir.1989). "A plaintiff is not required to prove that defendant's act was the sole and exclusive cause of his injury; he need only show that it was 'substantial', i.e., a significant contributing factor." *Ades v. Deloitte & Touche*, No. 90 Civ. 5056, 1993 WL 362364 at *12 (S.D.N.Y. September 17, 1993) (citing cases). However, demonstration of loss causation cannot be found if an intervening cause was responsible for the plaintiff's economic loss. *See, Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 258 & n. 12 (S.D.N.Y.1997) (loss causation in Section 10b–5 action is correlative to tort concept of proximate cause; loss must not be because of intervening causes such as industry wide phenomena); *Froid v. Berner*, 649 F.Supp. 1418, 1423 (D.N.J.1986) (intervening cause prevents recovery under Rule 10b–5); *Nutis v. Penn Merchandising Corp.*, 615 F.Supp. 486, 489 (E.D.Pa.1985), *aff. without op.*, 791 F.2d 919 (3d Cir.1986) (same); *see also, First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (in context of fraud, when factors other than defendant's fraud are an intervening

direct cause of plaintiff's injury, no loss causation is shown.)

## II. Because Plaintiffs have Failed to Demonstrate Loss Causation, Summary Judgment is Granted

█ Defendants contend that Unterberg has failed to adduce any facts demonstrating that the failure to disclose Haythorn's gambling problem was the proximate cause of an additional loss in Microlytics' value. As set forth above, summary judgment may be granted if Defendants can show that Unterberg will be unable to establish any one of the elements required by Section 10b–5:

> If the undisputed facts reveal that there is an absence of sufficient proof as to one essential elements of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment.

*Burke*, 981 F.2d at 1379 (citing *Celotex*, 477 U.S. at 322–23) (affirming summary judgment dismissal of Section 10b–5 where record contained no evidence form which a reasonable juror could conclude that alleged omission caused loss.)

The following facts are not in dispute: (1) Xerox was aware that Haythorn had a history of gambling problems at the time Unterberg invested in Microlytics and failed to disclose that fact; (2) an article discussing Haythorn's gambling problems was published in February 1996; (3) as a result of the article, Unterberg felt constrained to demand Haythorn's resignation because it was concerned about the Article's effect on potential investors; (5) the one investor interested in Microlytics, Inso, withdrew for reasons unrelated to the Article or to Haythorn's departure; (9) no further investors could be found and Microlytics went bankrupt.

According to Unterberg, Haythorn's departure also caused Xerox to withdraw its support from Microlytics, but Unterberg does not allege the manner in which support was diminished. Xerox's refusal to permit Inso to use its licensed technology does not constitute a failure of support as much as a protection of Xerox's assets.

█ Unterberg also asserts that Unterberg "was not alone in not wanting to invest in a company run by a gambler and forger," and therefore Haythorn's continued presence would have effectively put an end to Microlytics' efforts to raise additional capital. In addition, Unterberg contends that Haythorn's departure left Microlytics' management in such confusion that potential investors could not be effectively wooed.[2] However, Unterberg points to no potential investor who was frightened off by the publication of the Article or knowledge of Haythorn's gambling history. Unterberg does not assert that Inso's loss of interest is in any way related to Haythorn's gambling problems or his departure. Nor can Unterberg show that investors were interested in Microlytics when Microlytics' management was intact; in fact, insufficient investors responded to the prospectuses disseminated by Unterberg in the years prior to Haythorn's departure.

Finally, Unterberg has not shown that the decline in value of Microlytics' stock increased as a result of either the Article or Haythorn's departure. The stock was valued at $.08/share when Unterberg invested. It experienced a rise to $.19/share in December 1995, then dropped to $.12/share in January 1996. By February of 1996, the time of Haythorn's forced resignation, Microlytics' stock had dropped further to $.10/share. Two months later, in April, 1996, the stock was valued at $.065/share. The decline from December 1995 through April 1996 appears to be steady, without any precipitate drop following the events of February 1996. Such a drop did occur after negotiations with Inso

---

**2.** To the extent that Unterberg relies on claims of loss through mismanagement, it has failed to state a claim. It is well established that claims of corporate mismanagement, whatever their cause, are not actionable as a matter of law under Section 10b–5. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (in enacting Section 10(b), Congress did not seek to regulate transactions which constitute no more than internal corporate mismanagement); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982) ("It is well established by now that section 10(b) was not designed to regulate corporate mismanagement"); *Ciresi v. Citicorp*, 782 F.Supp. 819, 821–22 (S.D.N.Y.1991) *aff'd without op.*, 956 F.2d 1161 (2d Cir.1992) (dismissing complaint which did nothing more than accuse officers and directors of mismanagement).

came to nought, when shares fell to $.025/ share. However, because Unterberg itself does not assert that Inso lost interest as a result of the Article or Microlytics' managerial disarray, the "direct relation between the injury asserted and the injurious conduct alleged" is not established. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Hayden*, 955 F.Supp. at 258 ("to establish the required causation, the plaintiffs must show that the loss was a direct result of the defendant's wrongful actions").

In *Hayden*, plaintiffs, who had invested in a limited partnership which had gone out of business, filed claims against accountants who had provided financial services for the partnerships for, *inter alia*, a primary violation of Section 10(b) and Rule 10b–5. The court granted summary judgment to the defendants because the record demonstrated that the partnership's closure was caused by an industry slump, after a year-long decline resulting from a stagnation in the growth of new business and a decrease in profit. *Id.* at 258–59. Similarly, in the instant action, Unterberg has demonstrated nothing more than that Microlytics, always a risky investment, suffered a steady decline starting in December 1995 which was not visibly exacerbated by the Defendants' actions. Even before this decline, Microlytics had never been able to attract investors except for Unterberg itself. Without more, Unterberg cannot prevent grant of summary judgment to Defendants. *Bay*, 936 F.2d at 116.

### Discretionary Pendent Jurisdiction Over State Law Claims Will Not Be Exercised

Because Unterberg's federal claims are dismissed, pendent jurisdiction will not be exercised over its state common law claims. Although a court's exercise of pendant jurisdiction is discretionary, "a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims prior to trial." *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994) (citing *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *Ahmed v. Trupin*, 781 F.Supp. 1017, 1026 (S.D.N.Y.1992).

*Conclusion*

For the reasons set forth above, Defendants' summary judgment motion is granted, and Unterberg's complaint is dismissed.

It is so ordered.