SUEZ EQUITY INVESTORS, L.P. and
SEI Associates, Plaintiffs–
Appellants,

v.

The TORONTO–DOMINION BANK, Toronto Dominion (Texas), Inc., Toronto Dominion Capital (USA), Inc., Toronto Dominion Investments, Inc., Toronto Dominion Securities (USA), Inc., Toronto Dominion Holdings (USA), Inc., Philip Deroziere and Eric D. Rindahl, Defendants–Appellees.

No. 99–9042.

United States Court of Appeals,
Second Circuit.

Argued May 15, 2000.

Decided May 08, 2001.

William F. McCarthy, Boston, MA, (Michele T. Perillo, D. Ross Martin, Ropes & Gray, Boston, Massachusetts, of counsel), for Plaintiffs–Appellants.

David J. Woll, (Nancy L. Swift, Simpson Thacher & Bartlett, New York, NY, of counsel), for Defendants–Appellees The Toronto–Dominion Bank, Toronto Dominion (Texas), Inc., Toronto Dominion Capital (USA), Inc., Toronto Dominion Investments, Inc., Toronto Dominion Securities (USA), Inc., Toronto Dominion Holdings (USA), Inc., and Eric D. Rindahl.

Susan E. Brune, (Laurie Edelstein, Nina M. Beattie, Brune & Richard LLP, New York, NY, of counsel), for Defendant–Appellee Philip DeRoziere.

Before JOHN M. WALKER, Jr., Chief Judge, CARDAMONE, and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal arises out of defendants' invitation to plaintiffs to invest in the ill-fated SAM Group, a health-care financing venture. Plaintiffs allege that defendants discouraged them from inquiring into the background of SAM Group's principal, J. Christopher Mallick, and instead provided them with what was purportedly the report of an independent investigator who had performed a background check on Mallick, but was in fact a modified version of that report with adverse information deleted. Plaintiffs thereafter invested in SAM Group in reliance on the modified report. When SAM Group subsequently failed financially, this securities fraud litigation ensued.

## BACKGROUND

SAM Group, whose securities are at the center of this suit, comprises seven business entities that purchase and finance the accounts receivable of health care providers. The Toronto–Dominion Bank invested $3.35 million in SAM Group in April 1996 through its affiliate Toronto Dominion Investments. Over the next several months, Toronto Dominion Investments and the Toronto–Dominion Bank, acting through another affiliate, Toronto Dominion (Texas) Inc., invested further in SAM Group, and by October 1996, their total investment had grown to over $11 million. The Toronto–Dominion Bank allegedly controlled both Toronto Dominion Investments and Toronto Dominion Texas through its subsidiary Toronto Dominion Holdings (USA) Inc., which is parent to both entities.

In October 1996 the Toronto–Dominion Bank approached plaintiffs, Suez Equity Investors, L.P. and SEI Associates, through its subsidiary Toronto Dominion Capital (USA) Inc. with the proposal that plaintiffs invest in SAM Group. We will not repeat the phrase "Toronto–Dominion" in front of each corporate entity throughout this opinion, but will instead refer to these separate corporations as "Bank," "Investments," "Texas," "Holdings," "Capital," and "Securities" (for Toronto Dominion Securities (USA), Inc.).

SAM Group retained Capital as its agent in selling securities to plaintiffs. Capital provided plaintiffs with information about SAM Group through, among others, its employee and codefendant Eric D. Rindahl. Defendant Philip DeRoziere allegedly acted for the Bank in the sale. In late 1996 plaintiffs informed defendants that they would like to commission background reports on five SAM Group principals, including Mallick, who was SAM Group's founder, principal executive, and controlling shareholder. Mallick and the defendants, including Rindahl, objected to having such reports prepared as an unnecessary expense and proposed that plaintiffs instead accept a copy of a prior background check DeRoziere had obtained on behalf of the Bank (Original Bishops Report) in August 1995. Rather than providing plaintiffs with the Original Bishops Report, however, defendants furnished a modified version of it (Modified Report) with a cover memorandum describing the Modified Report as a "report of the result of investigations performed by Bishops Services, Inc. on SAM Group principals." 2d Am. Compl. ¶ 61. The Modified Report was delivered to plaintiffs between December 13, 1996 and January 2, 1997. DeRoziere had originally distributed the Modified

Report to various entities in September 1995 after the receipt of the Original Bishops Report by a financial rating agency had prompted a request for more information about Mallick's bankruptcy and other events in his past.

Unlike the Original Bishops Report, the Modified Report omitted negative events in Mallick's business and financial history. Specifically, the Modified Report stated that: (1) no bankruptcy filings were found for Mallick, while the Original Bishops Report had described in some detail his involuntary Chapter 7 bankruptcy arising out of personal guarantees on business debts; (2) no pending civil suits were found for any individual subjects being investigated, but the Original Report had identified three civil suits filed against Mallick; and, omitted mention: (3) of a 1993 suit brought against Mallick by a gemstone business, in which he had been a joint venturer, where plaintiff sought the repayment of $250,000 borrowed from the business; (4) of three tax liens against Mallick personally, including one in the sum of $30,475, as well as a $3,233 tax lien against SAM Group's predecessor, which derived from $78,000 of unpaid federal taxes in the 1980s and $400,000 in the 1990s; and (5) of (a) several lawsuits that had been decided against Mallick, (b) his delinquent credit accounts, and (c) a critical comment made about him by a third party.

In a conference call on January 2, 1997, the defendants, including DeRoziere, stated that the Bank had conducted extensive due diligence on Mallick before investing in SAM Group and that the investigation had yielded positive comments. Defendants did not reveal that the Modified Report plaintiffs received was not the original report prepared as part of due diligence. On February 14, 1997 plaintiffs purchased $3 million in SAM Group debt and equity securities.

Defendants' substantial loans to SAM Group reflected the Group's liquidity problems, which the complaint attributes to Mallick's inability to manage the Group's finances effectively. When plaintiffs invested in the Group, "Mallick had put SAM Group in a financial position in which SAM Group had no chance to succeed [because it] had no access to working capital." *Id.* ¶ 67. As a result, plaintiffs' SAM Group securities were at the time of acquisition—and are today—worthless. Within seven weeks of plaintiffs' investment, SAM Group suffered a cash flow crisis from which it did not recover.

Plaintiffs attribute that failure to Mallick's lack of "sound business, financial management and organizational skills, sound judgment, character, honesty, commitment and diligence." *Id.* ¶ 86. They contend that the business of SAM Group was "one involving sophisticated manipulation and control of finances," requiring the "leadership of a person who knew how to manage a debt load." *Id.* ¶ 66. In support of the importance they attached to the attributes of the individual who was to lead the Group, they note that their investment agreement required the Group to obtain $10 million of "key-man" life insurance payable in the event of Mallick's death.

On January 23, 1998 plaintiffs filed the instant suit in the United States District Court for the Southern District of New York before Judge Kimba M. Wood. Later they filed an amended complaint, alleging violations of Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b) (1994); Rule 10(b)(5), 17 C.F.R. § 240.10b–5 (2000); and Securities Exchange Act § 20, 15 U.S.C. § 78t (1994), and asserting state law causes of action for common law fraud and negligent misrepresentation. On January 15, 1999 the district court dismissed the amended complaint under Rules

12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (Litigation Reform Act), 15 U.S.C. § 77a *et seq.* (Supp. IV 1998), but granted plaintiffs leave to replead. Plaintiffs filed a second amended complaint, which was dismissed on August 5, 1999 on the same grounds as the amended complaint. From the dismissal of their second amended complaint, plaintiffs appeal.

## DISCUSSION

Three major issues are presented. First, do the allegations that defendants misled plaintiffs as to the background of SAM Group's principal suffice to allege loss causation? Second, have the plaintiffs alleged *scienter?* Third, have the plaintiffs alleged a "special relationship" sufficient to support a negligent misrepresentation claim under New York law? We analyze these issues in order in the discussion that follows.

 The district court's dismissal was based on its view that plaintiffs had failed to state a claim and had failed to plead fraud with particularity. We review the grant of a motion dismissing a complaint *de novo,* affirming only if—after accepting all the allegations in the complaint as true and drawing all inferences in favor of the plaintiffs—the complaint does not allege any set of facts that would entitle plaintiffs to relief. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994). Rule 9(b) of the Federal Rules of Civil Procedure governs the pleading of fraud claims and it requires that plaintiff plead fraud with particularity. We have explained that this standard imposes an obligation on plaintiff to "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

## I Federal Securities Claims

### A. *Loss Causation*

#### 1. In General

The federal securities fraud claim was dismissed on the ground that the complaint does not allege loss causation. In so ruling the district court stated that "plaintiffs have failed to demonstrate that the subject matter of the alleged fraud caused the losses of which they complain." It concluded that SAM Group's demise was caused by a cash flow crisis precipitated by weeks of liquidity problems that *pre* dated Suez's investment. The trial court further believed that the only wrongdoing alleged in the complaint was poor decisionmaking on Mallick's part—in other words, corporate mismanagement, which is not a cognizable basis for a securities fraud claim.

 For an allegation under SEC Rule 10b–5 to be sustained, a plaintiff must show that " 'in connection with the purchase or sale of securities, the defendant, acting with *scienter,* made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 534 (2d Cir.1999) (alterations in original) (quoting *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 264 (2d Cir.1993)). It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered. *See Mfrs. Hanover*

*Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 20 (2d Cir.1986) ("The standard for liability in a civil action under section 10(b) is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered."). The Litigation Reform Act similarly requires the plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment. Loss causation is somewhat different. It has been likened to the tort concept of proximate cause, meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992). In sum, to escape dismissal of a securities fraud complaint, the plaintiff must demonstrate that the fraud caused the plaintiff to engage in the transaction and that it also caused the harm actually suffered. *See Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (per curiam).

Because these concepts are somewhat elusive, they are the subjects of extensive scholarly and judicial comment. The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994); *Citibank*, 968 F.2d at 1495 (holding that to establish loss causation plaintiff must show that the economic harm it suffered *occurred as a foreseeable result of* the alleged misrepresentations). Related factors include whether intervening causes are present, *see First Nationwide*, 27 F.3d at 769; *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir.1990) (explaining that if ventures failed because of industry-wide phenomena, rather than purported fraud, plaintiff could not demonstrate loss causation), and the lapse of time between the fraudulent statement and the loss, *see First Nationwide*, 27 F.3d at 772 (stating that a significant lapse of time between defendant's actions and plaintiff's injury increases the likelihood that the loss occurred due to events in the interim). In the end, whether loss causation has been demonstrated presents a public policy question, the resolution of which is predicated upon notions of equity because it establishes who, if anyone, along the causal chain should be liable for the plaintiffs' losses. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 217 (2d Cir.2000). A finding of foreseeability must satisfy the judicial mind that such result conforms to "a rough sense of justice." *Palsgraf v. L.I.R.R. Co.*, 248 N.Y. 339, 352, 162 N.E. 99 (1928) (Andrews, J., dissenting).

### 2. Adequacy of the Allegations

Plaintiffs have adequately alleged loss causation against the defendants. A liberal reading of the complaint reveals allegations that the misrepresentations in the Modified Report led plaintiffs to appraise the value of SAM Group securities incorrectly by assuming the competency of Mallick, the Group's principal. Plaintiffs assert that Mallick's ability to manage complex debt loads was essential to the success of a financing business like SAM Group, and that his importance to the venture's success, as well as their belief in his importance, was evidenced by the investment agreement's provision for a large amount of life insurance on Mallick.

The alleged deliberate concealment of the financial and business problems of the leader of SAM Group, the complaint goes on to allege, gave plaintiffs an inaccurate perspective from which to value the Group securities. If defendants had not provided the Modified Report, plaintiffs assert, they would have conducted their own due diligence investigation of Mallick, would have uncovered the various negative facts about his background, and would not have invested in SAM Group. Under this chain of factual allegations, it would have been foreseeable to defendants that facts concealed in the Modified Report would have indicated Mallick's inability to run the Group, and would have forecast its (eventually fatal) liquidity problems. These allegations in our view are adequate to survive a motion to dismiss on the ground of failure to sufficiently plead loss causation.

A comparison of *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.1980), and *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir.1985), elucidates why the plaintiffs' allegations of loss causation are sufficiently particular. In *Marbury Management*, a trainee at a brokerage firm had falsely claimed that he was a stockbroker and "portfolio management specialist," and persuaded several clients to invest in his recommended stocks, overcoming the clients' own reservations. 629 F.2d at 707. We affirmed the jury verdict for the plaintiffs, stating that "only the loss that might reasonably be expected to result from action or inaction in reliance on a fraudulent misrepresentation is legally, that is, proximately, caused by the misrepresentation." *Id.* at 708. In *Bennett*, conversely, we affirmed the dismissal of a complaint that alleged that the defendants had misrepresented to the plaintiffs that the Federal Reserve's margin rules did not apply to public utility shares pledged to a bank as collateral. The plaintiffs had alleged that they would not have invested if

they knew the rules did in fact apply, and thus defendants were responsible for their losses when the value of the stock declined. *See* 770 F.2d at 310, 314.

We distinguished *Marbury Management* on the grounds that in that case the misrepresentation related to the value of the shares—specifically, the reliability of the trainee's valuation—while in *Bennett*, the misrepresentation related to rules extrinsic to the decline in the securities' value. *Id.* at 314. We went on to observe that had plaintiffs known the seller in *Marbury Management* was an inexperienced trainee without expertise they would not have accepted his recommendations to buy stock. *Id.* Such a misrepresentation, we thought, misled plaintiffs with respect to the "investment quality" of the stock, although the misrepresentation was not directly related to the stock's intrinsic investment characteristics. *Id.* Thus, because the misrepresentation in *Marbury Management* induced the purchase (transaction loss) and related to the stock's value (loss causation), it was causally related to the loss. In *Bennett* since the margin rules were extrinsic to the stock, the complaint failed to allege loss causation. *See id.; see also Mfrs. Hanover Trust*, 801 F.2d at 22 (holding that misrepresentations by defendant accounting firm about the financial status of its client—a company trading in repurchase agreements—proximately caused the plaintiff's loss, as those misrepresentations pertained to the "investment quality" of the repurchase agreements selected).

█ The rule derived from the holdings of *Marbury Management* and *Bennett* is that plaintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresenta-

tions induced a disparity between the transaction price and the true "investment quality" of the securities at the time of transaction.

The allegations of loss causation are at least as strong in the present case as they were in *Marbury Management*. In *Marbury Management*, the misrepresentations pertained to the "investment quality" of the securities, as a reasonable investor would presumably accord less deference to a trainee than it would to a broker when valuating a recommended stock. 629 F.2d at 707. In the instant dispute the misrepresentations were similarly relevant to the "investment quality" of SAM Group securities, as the defendants allegedly concealed a lack of skills and expertise on the part of the company's principal that, if revealed, would directly affect the plaintiffs' valuation of their investment in the company.

The complaint thus alleges that plaintiffs suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants. Plaintiffs have also adequately alleged a second, related, loss—that Mallick's concealed lack of managerial ability induced SAM Group's failure. The complaint contends that the Group was involved in highly sophisticated financial transactions in which the expertise of a skilled executive officer was essential. *See* 2d Am. Compl.

¶ 66. Plaintiffs allege that it was entirely foreseeable at the time of the misrepresentation that the Group would fail if guided by an individual who did not possess the requisite skill to manage complex debt loads. Since defendants reasonably could have foreseen that Mallick's concealed lack of skill would cause the company's eventual liquidity problems, defendants' misrepresentations may be the causal precursor to the Group's final failure. *Cf. Mfrs. Hanover Trust*, 801 F.2d at 20–21 (holding that defendants may be held liable for the "foreseeable consequences of [their] misrepresentation").[1]

The district court's reliance on *Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp.*, 995 F.Supp. 437 (S.D.N.Y. 1998), in granting the motion to dismiss is misplaced. In that case, the plaintiff sued Xerox, as financial backer of a company, Microlytics, in which the plaintiff had invested and which subsequently failed. *Unterberg* held that plaintiff's allegations that Xerox had neglected to disclose the gambling problems of the CEO of Microlytics were not sufficient to allege loss causation. *See id.* at 442. Rather than holding that a principal's failings could never suffice for loss causation, the district court simply found that the lack of investor interest in Microlytics was unrelated to

---

1. The standard that we have employed in this opinion attempts to reconcile what we view as our somewhat inconsistent precedents on loss causation. *See, e.g., First Nationwide Bank v. Gelt Funding Co.*, 27 F.3d 763, 769–70 (2d Cir.1994) (recognizing "foreseeability" approach, but relying on "direct causation" analysis for loss causation); *Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (per curiam) (following "foreseeability" approach); *Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 22 (2d Cir.1986) (finding loss causation where "investment quality" of securities was misrepresented). Were we unconstrained by our own precedents, we might propose a different standard. We note that

the approach of the Seventh Circuit—inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud—appears to be both principled and predictable. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685–86 (7th Cir.1990); *see also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997) ("To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries."). But, we are not writing on a blank slate, and believe that the approach here articulated best reconciles our precedents to date.

the shortcomings of its CEO. *See id.* at 442–43. In the present action, conversely, plaintiffs have adequately alleged that Mallick's lack of *business* acumen proximately caused SAM Group's financial troubles.

■ Nor are we able to agree with the trial court's intimation that, as a matter of law, the Group's preexisting liquidity problems caused its demise. On a motion to dismiss we draw all inferences in favor of the pleader. The complaint could reasonably be read as alleging that Mallick had himself caused the liquidity problems and that such could not be resolved so long as he remained at the company's helm.

### 3. Corporate Mismanagement

■ We next address the district court's conclusion that § 10(b) and Rule 10(b)(5) are inapplicable under the rule of *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), because the complaint alleges only corporate mismanagement. This holding, we believe, misinterprets *Santa Fe.* There the Supreme Court held that § 10(b) and Rule 10(b)(5) do not apply in the absence of deceptive or manipulative devices. *See id.* at 473, 97 S.Ct. 1292. Plaintiffs in the present case *have* alleged deception on the part of defendants, contending that the Modified Report, and communications relating to it, deliberately misrepresented the abilities of Mallick.

Our application of *Santa Fe* in *Field v. Trump,* 850 F.2d 938 (2d Cir.1988), is not to the contrary. In *Field* the complaint alleged that various "material facts" were not disclosed prior to a corporation's tender offer and merger. *Id.* at 946. Most of these "material facts" were that the corporation's directors and officers, through various acts, had breached their fiduciary duties to the shareholders. *See id.* We reaffirmed the view that the federal securi-

ty laws were not intended to "bootstrap" garden-variety state law claims of breach of fiduciary duty into federal securities claims for failure to disclose. *Id.* at 947–48.

■ The distinction between *Field* and the case at bar is that in the former, the only alleged failure of management is that during its internal decisionmaking it rejected, and did not disclose, alternative business opportunities. *See id.* at 946. In the present case, conversely, defendants allegedly made an affirmative misrepresentation to plaintiffs, as outside investors, concerning the quality of the proffered securities. Rather than a *post hoc* critique of management decisions, plaintiffs contend that they were deceived by the Modified Report into purchasing a financial instrument that they would have otherwise avoided. Post-stock-purchase corporate mismanagement or breach of fiduciary duty may be just as reprehensible as a misleading statement regarding the value of a security to be sold, but the former is not proscribed by § 10(b), while the latter is actionable. *See Panos v. Island Gem Enters., Ltd.,* 880 F.Supp. 169, 179 (S.D.N.Y.1995). The basis of plaintiffs' complaint is not simply that they disagree with the business choices of SAM Group, but rather that they were allegedly lulled into foregoing an investigation into Mallick's background and, ultimately, into investing in the Group to their loss.

### B. *Scienter*

■ The district court held that plaintiffs had failed to meet § 10(b)'s *scienter* requirement, which demands that plaintiffs establish a "strong inference" of fraudulent intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *see also Press*, 166 F.3d at 538; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996). To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize "concrete benefits" through the deception. *Shields*, 25 F.3d at 1130.

▓▓▓ The trial court appears to have thought that plaintiffs adequately pled one prong of this standard, opining that "defendants may have had a motive to fraudulently induce plaintiffs to purchase SAM Group securities, in that their own investments would be covered." We agree that three of the corporate defendants, the Bank, Investments, and Texas, as creditors or equity holders in the company, had a motive for fraud based upon their own at-risk investments. But plaintiffs have not alleged any motive for Securities, Holdings, or Capital to fraudulently induce plaintiffs because there is no averment in the complaint that these defendants had a financial stake in the Group.

▓▓▓ Where we think the district court went astray is in its holding that plaintiffs did not satisfactorily allege opportunity with respect to any of the Toronto Dominion defendants. In so doing it failed to draw all reasonable inferences in favor of the non-movant when it found defendants did not have "superior knowledge as to the alleged forgery of the Bishops Report." The complaint alleges that DeRoziere, acting for the Bank, Investments, and Texas received the Original Report from Bishops Services in August 1995 and that he first circulated the Modified Report a month later. Plaintiffs further alleged that DeRoziere was acting on behalf of the corporate defendants in disseminating the allegedly doctored report, as he was "the relationship manager for SAM Group, [and] an employee of [the Bank] in 1995, and ... the Toronto Dominion Defen-

dants' initial investment in SAM Group was made through [Investments], a subsidiary of [Securities and Capital]," which in turn are subsidiaries of Holdings.2d Am. Compl. ¶ 54. This averment constitutes an adequate allegation that DeRoziere knew of the discrepancies between the Original and Modified Reports, and that he was acting as defendants' agent, and in their interest, in perpetrating the alleged deception. Hence, the complaint expressly alleges conscious misbehavior on the part of DeRoziere and opportunity for Bank, Investments, and Texas, although defendants' arguments with respect to the scope of DeRoziere's agency are best left to a later stage in the litigation.

▓▓▓ The district court correctly ruled that Rindahl and his principal Capital did not have the requisite opportunity to justify a finding of *scienter*. Nothing in the complaint suggests that Rindahl or anyone else at Capital knew the contents of the Original Bishops Report or that anyone in the employ of Capital recklessly misbehaved while negotiating with plaintiffs. The district court therefore appropriately dismissed the § 10(b) claim as to defendants Rindahl, Capital, Holdings, and Securities.

The Toronto Dominion defendants and Rindahl make three other arguments against finding *scienter*. First, they contend that under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and *Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir.1998), they are not liable for the acts of DeRoziere. These cases are inapposite. In *Central Bank* the Supreme Court held that a party may not bring a cause of action against one actor under § 10(b) for aiding and abetting the violation by another actor because § 10(b) does not prohibit aiding and abetting. *See* 511 U.S. at 191, 114

S.Ct. 1439. *Wright* simply applied that holding. *See* 152 F.3d at 175.

The distinction between the case at bar and those cited is that in *Central Bank* and *Wright* there was no allegation that the defendants were agents of the alleged defrauder, acting for the defrauder. Rather, the *Central Bank* and *Wright* plaintiffs only alleged that the defendants knew of the purported fraud through transactions with the defrauders, but failed to expose the deception. *See Cent. Bank*, 511 U.S. at 167–69, 114 S.Ct. 1439 (plaintiff alleged that defendant-petitioner, indenture trustee for the alleged defrauder, was aware appraisal might not be accurate but delayed review until bonds were issued); *Wright*, 152 F.3d at 171–72 (plaintiff alleged that defendant-appellee, outside auditor for alleged defrauder, knew of problems with financial statements distributed as "unaudited" and without mention of auditor's name).

■ *Central Bank* did not eliminate *primary* liability for business entities. *See* 511 U.S. at 191, 114 S.Ct. 1439 ("Any person or entity, including a lawyer, accountant, or bank, ... may be liable as a primary violator under 10b–5 ...."). Plaintiffs, in the present case, do not simply allege that the corporate defendants knew, but failed to disclose, an alleged fraud; rather, they assert that defendants violated § 10(b) *in their own right* by responding with a forged report when plaintiffs expressed their intention to perform a background check on Mallick. The fact that DeRoziere, or any other agent of the corporate defendants, may have supplied the report does not preclude them from primary liability. A corporation can only act through its employees and agents, *see, e.g., Cedric Kushner Promotions, Ltd. v. King*, 219 F.3d 115, 116 (2d Cir.2000) (per curiam), and an allegation that a particular agent may have doctored or conveyed the

report will not immunize the principals from liability for a knowing deception.

Second, the corporate defendants warrant that plaintiffs' § 20 claims must fail because the complaint does not allege any facts supporting a finding that the corporate defendants or Rindahl controlled DeRoziere. Section 20 provides

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1994).

■ "Controlling-person liability" under § 20 of the Securities Exchange Act is a separate inquiry from that of primary liability and provides an alternative basis of culpability. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975). Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996).

■ The complaint alleges that DeRoziere was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group. *See* 2d Am. Compl. ¶ 16. While somewhat broad, this allegation is sufficient to plead controlling-person liability for the Bank derived from DeRoziere, the purported primary violator.

The complaint also alleges that Capital, Securities, and Holdings controlled various of the other corporate defendants. *See id.* ¶¶ 12, 14–15. These vague allegations are conclusory at best, indicating only that certain employees worked for multiple defendants, and are insufficient under § 20 as a matter of law. Rindahl is not alleged to control any of the other defendants and is therefore not a controlling person under this provision.

The defendants' final argument against a finding of *scienter* is that since the Modified Report was allegedly prepared in 1995, two years prior to plaintiffs' investment in the Group, it was not created in order to mislead them. Such circumstance is irrelevant. The defendants confuse the original preparation of the Modified Report with the issue in this case, the later delivery of the Modified Report to the plaintiffs. So long as knowledge of the inaccuracies in the Modified Report can be imputed to the defendants, their original motive in preparing the misleading document is irrelevant. Defendants provide no reason to think that defendants' purported knowledge about the modifications dissipated in the intervening two years. Acceptance of the defendants' contrary position would immunize a wrongdoer from liability when a fraudulent document that had been prepared with one intended victim in mind later was used to defraud another.

## II Dismissal of Pendent State Law Claims with Prejudice

Plaintiffs argue the district court abused its discretion in reaching their pendent state law claims of negligent misrepresentation and common law fraud, and then dismissing these claims with prejudice. Judge Wood was well within her discretion to reach these claims. The operative facts in the state and federal causes of action are the same, satisfying the Article III requirements for pendent jurisdiction. *See Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir.2000) (discussing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Nor was it error for the district court to reach the state law causes of action against defendants Rindahl, Capital, Holdings, and Securities after dismissing the federal securities claims against them. The standards governing the state and federal law causes of action are similar and, in addressing the latter, Judge Wood was obliged to explore fully the allegations in the complaint. Reaching the state law claims was entirely appropriate as an exercise of the district court's discretion. *See* 28 U.S.C. § 1367 (1994); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir.1997) (finding no abuse of discretion in dismissing state age discrimination claims along with ADEA claim).

## III Negligent Misrepresentation

The district court dismissed plaintiffs' negligent misrepresentation action on two grounds: first, it held that plaintiffs had not alleged loss causation, "an essential element of a claim for negligent misrepresentation," and second, it found that plaintiffs had not sufficiently alleged the existence of a "special relationship" between the parties. We have already explained that plaintiffs adequately alleged loss causation. So we turn to whether or not a special relationship was asserted.

### A. *Existence of a "Special Relationship"*

The New York Court of Appeals recently discussed the "special relationship" component of a negligent misrepresentation claim in *Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d

450 (1996). Defendants rely predominately upon our decision in *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 158 (2d Cir.1995) (holding that no special relationship exists in a banking relationship generally). But *Banque Arabe* was decided before *Kimmell,* and is therefore of limited precedential value on this issue of state law. In *Kimmell* the Court of Appeals held that whether a special relationship exists between two parties is an issue of fact, to be governed by the weighing of three factors:

> In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

89 N.Y.2d at 264, 652 N.Y.S.2d 715, 675 N.E.2d 450. The facts in *Kimmell* are relatively analogous to those in the present case. The defendant, chair of the board and later chief financial officer of an energy company, had sought investors for a cogeneration project that his firm was implementing. Defendant provided plaintiffs with multiple sets of financial projections for the project, but each time failed to account for a highly publicized new state utility rate structure that would render cogeneration economically impractical. *See id.* at 261–62, 652 N.Y.S.2d 715, 675 N.E.2d 450. Plaintiffs, relying upon the information provided, invested in the project, soon after lost their money, and brought suit in New York. The Court of Appeals affirmed defendant's liability for negligent misrepresentation. *See id.* at 266, 652 N.Y.S.2d 715, 675 N.E.2d 450.

In so holding, *Kimmell* distinguished between " 'casual' statements and contacts" that a seller would make informally in the course of a day's business, and "deliberate representation[s]" that give rise to a duty to speak with care. *Id.* at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450. Similarly, the present complaint alleges that defendants repeatedly assured plaintiffs that they had performed extensive due diligence on SAM Group, and they explicitly represented that only positive information on the Group's principal had been uncovered. *See* 2d Am. Compl. ¶¶ 61–63. These assurances constitute considered responses to inquiries that were plainly of some importance to plaintiffs.

■■■ The district court, in dismissing the negligent misrepresentation claim, relied upon the purported failure of the complaint to allege a "special relationship of trust or confidence" between the two parties. Yet, plaintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information. *See id.* ¶ 108. Moreover, to the extent that a "special relationship of trust" is sparsely pled, the complaint emphatically alleges the other two factors enunciated in *Kimmell.* First, as investors in SAM Group (or intermediaries therewith) and holders of the Bishops Report, Rindahl, DeRoziere, the Bank, Capital, Investments, and Texas appeared to possess— and held themselves out as possessing— special knowledge about the Group generally, and Mallick in particular. Second, these defendants knew that plaintiffs sought information about Mallick to aid their investment decision and defendants supplied it for that purpose, while dissuad-

ing plaintiffs from conducting their own investigation. Given that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations are sufficient to overcome a motion to dismiss. Plaintiffs' conclusory allegations with respect to Securities and Holdings, however, fail.

Nor are we persuaded by defendants' reliance on the October 31, 1996 Confidentiality Agreement between Indosuez and Capital. The Confidentiality Agreement states: "you acknowledge that neither Toronto Dominion Bank nor any of its agents ... make any representation or warranty, either express or implied, as to the accuracy or completeness of the Evaluation Material," and appears to exclude information in the public record from the term "Evaluation Material." Even assuming that consideration of the Confidentiality Agreement is appropriate at this stage in the proceedings, at best, it conflicts with defendants' alleged oral statements in the January 2, 1997 conference call. The disclaimer would not cover the subsequent telephone conversation, in which defendants allegedly represented that the Bank and DeRoziere had extensively investigated SAM Group prior to their investment and had received favorable feedback on him. The tension between the telephone conversation and the Confidentiality Agreement cannot be resolved on the pleadings.

### B. *Martin Act*

 Defendants argue for the first time on appeal that the Martin Act, N.Y. Gen. Bus. Law Art. 23–A, §§ 352 *et seq.*, New York's blue sky law governing securities fraud, preempts common law negligent misrepresentation claims relating to the sale of securities. We generally will not address an issue first raised on appeal except to prevent obvious injustice or, in rare cases, when the issue is suitable for decision on the record, without additional factfinding. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994).

We do not reach the Martin Act question. The New York Court of Appeals has not yet addressed this issue, and the lower court cases cited by defendant do not explore the issue with the level of depth that would justify a ruling by us in the first instance. *See Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.,* 191 A.D.2d 621, 622, 595 N.Y.S.2d 492 (2d Dep't 1993) (relying on *CPC Int'l Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 276–77, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987), which held that there is no implied private right of action under the Martin Act); *Horn v. 440 E. 57th Co.,* 151 A.D.2d 112, 120, 547 N.Y.S.2d 1 (1st Dep't 1989) (same). We are not immediately persuaded that the Court of Appeals would follow their lead, nor have the parties referred us to any apposite federal precedent. Accordingly, since no "obvious injustice" would befall the defendants, we leave the resolution of this issue in the first instance to the district court. *Greene,* 13 F.3d at 586.

### IV Common Law Fraud

 The trial court dismissed plaintiffs' common law fraud claim, holding that the complaint failed to plead loss causation and failed to allege that the corporate defendants and Rindahl actually knew of the modifications to the Bishops Report. A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury. *See Jo Ann Homes at Bellmore,*

*Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969); *see also Citibank,* 968 F.2d at 1496. The claim also requires a showing of proximate causation, such that the injury "is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986).

We reverse the dismissal of this claim for the reasons set forth in Part I above. The complaint adequately alleges loss causation, the analogue of the tort concept of proximate cause. Plaintiffs also allege that DeRoziere was the agent of some of the corporate defendants when he received the Original Bishops Report, and that he was acting on behalf of those defendants when he disseminated the Modified Report. This is sufficient to plead fraud on the part of the Bank, Texas, Investments, and DeRoziere. The district court correctly ruled that the complaint contained insufficient allegations to support a claim of common law fraud against Rindahl, Capital, Holdings, or Securities.

## CONCLUSION

For the reasons stated, we affirm the district court's dismissal of the complaint, insofar as it fails to allege a securities fraud claim against defendants Rindahl, Capital, Holdings and Securities; we also affirm its dismissal of the pendent state common law fraud claim with respect to these defendants. But we reverse the district court's dismissal of the § 10(b) and common law fraud claims as to defendants Bank, Texas, Investments, and Philip DeRoziere. The dismissal of the § 20 claim against the Bank is vacated. We also vacate the dismissal of the negligent misrepresentation claim against the Bank,

Texas, Investments, Capital, Rindahl, and DeRoziere. The case is remanded to the district court for further proceedings not inconsistent with this opinion.