08-0612-cv

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: May 5, 2009                    Decided: March 9, 2010)

Docket No. 08-0612-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE: OMNICOM GROUP, INC. SECURITIES LITIGATION

NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM,

            Plaintiff-Appellant,

PHILIP SZANTO, DR. JOSEPH S. FISHER, M.D. PROFIT SHARING PLAN, on behalf of itself and all others similarly situated, DIANEE GLYNN, on behalf of herself and all others similarly situated, RICHARD LEHAN, PETER "PETER KIM", EDWARD KAIMINSKI, SUSAN BLACK, MATT BRODY, AMY HOFFMAN, ROBERT E. GARREN, and ALAN MIRKEN,

            Consolidated-Plaintiffs,

                v.

OMNICOM GROUP, INC., JOHN WREN and RANDALL J. WEISENBURGER, BRUCE CRAWFORD and PHILIP J. ANGELASTRO,

            Consolidated-Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   FEINBERG, WINTER, and CABRANES, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York (William H. Pauley III, Judge) granting defendants' motion for summary judgment. The district court held that defendants were entitled to summary judgment on plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because plaintiffs failed to show loss

1

causation. We affirm.

JOHN P. COFFEY, Bernstein Litowitz Berger & Grossmann LLP, New York, New York, for Plaintiff-Appellant and the Certified Class.

PETER A. WALD (Jeff G. Hammel, Latham & Watkins LLP, New York, New York; Janey Mallow Link, Latham & Watkins LLP, Chicago, Illinois, of counsel; Abid R. Qureshi, Latham & Watkins LLP, Washington, D.C., of counsel, on the brief) Latham & Watkins LLP, New York, New York, for Defendants-Appellees.

WINTER, Circuit Judge:

The New Orleans Employees' Retirement System, the lead plaintiff in this class action, appeals from Judge Pauley's grant of summary judgment dismissing its complaint alleging securities fraud in violation of Section 10(b), 15 U.S.C. § 78j(b), against Omnicom Group, Inc. and its managers. The district court held that appellant proffered no evidence sufficient to support a finding of loss causation.

For the reasons set forth below, we affirm.

BACKGROUND

Given the procedural posture of this matter, an appeal from a grant of summary judgment dismissing a complaint, "we construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [its] favor." Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 217 (2d Cir. 2006).

a) The Seneca Transaction

2

Omnicom is a large global marketing and advertising holding company. Around 1996, Omnicom began using its subsidiary, Communicade, to invest in internet marketing and advertising companies. The value of the internet companies began to decline in 2000. Omnicom determined that these losses were not "other-than-temporary impairment[s]," and thus non-reportable, a position that was reviewed without exception by Arthur Andersen.

During the first quarter of 2001, Omnicom entered into a transaction with Pegasus Partners II, L.P., a Delaware private equity firm, that created a new company, Seneca, owned by both Omnicom and Pegasus. In a press release, Omnicom and Pegasus stated that the objective of the Seneca transaction was to "maximize consolidation and other strategic opportunities among companies in the currently depressed e-services consulting and professional services marketplace." The Seneca transaction involved Omnicom's transfer to Seneca of $47.5 million in cash and its Communicade subsidiary, whose sole assets were the internet companies, and Pegasus's promise to transfer a total of $25 million in cash, $12.5 million up front and $12.5 million when Seneca requested it. Omnicom received $325 million in Seneca's non-voting preferred stock, while Pegasus received all of Seneca's common stock. Omnicom reported that it would incur no gain or loss from this transaction because it was exchanging the internet companies, purported to be worth $277.5 million, and $47.5 million in cash for preferred stock of equivalent value.

Appellant alleges that the accounting for the Seneca

transaction was fraudulent, a claim we assume to be true, albeit one that is disputed.  While Omnicom's auditors, it is claimed, viewed Pegasus's willingness to invest $25 million in Seneca as support for Omnicom's valuation of the internet companies at $277.5 million, there is evidence that, despite the representations that Pegasus would immediately transfer $12.5 million to Seneca, it instead transferred only $100 to Seneca, while transferring the $12.5 million to a Pegasus holding company.  Appellant argues that this fact, which was not disclosed to the market in any of the news articles that appellant relies on, raises doubts about Omnicom's valuation of the assets transferred to Seneca.

Appellant also claims that Omnicom misrepresented the value of its Seneca stock to its auditors at the end of 2001.  To conceal the decline in the value of Seneca's assets, Omnicom is said to have arranged for Seneca, rather than Omnicom, to buy a technology license from Live Technology Holdings, Inc., one of Seneca's investee companies.  Seneca would then sell the license to Omnicom for $75 million.  The $75 million would nearly offset Seneca's yearly losses.

b) Publicly Available Information About the Seneca Transaction

Several news articles at or near the time reported the Seneca transaction and suggested that it was an attempt to move the internet companies, whose value was deteriorating, off

4

Omnicom's books.[1]  Indeed, observers expressed these views well into 2002.[2]  However, Omnicom's stock never experienced any statistically significant drop in value at or near the time of these news reports.

On June 5, 2002, Omnicom filed a Form 8-K disclosing that Robert Callander, an outside director and Chair of Omnicom's Audit Committee, had resigned from its board of directors on May 22, 2002.  Although the Form 8-K did not disclose the reason for Callander's resignation, appellant argues that it was because of Callander's concern over the accounting of the Seneca transaction.  Appellant relies on Callander's request for a review of the Seneca transaction by a separate accounting firm, his handwritten notes on a copy of Omnicom's 2001 Form 10-K, his request for Seneca's financial statements, questions he asked

---

[1]On May 7, 2001, Advertising Age published an article stating that the Seneca transaction "was seen by some as a way for Omnicom to get struggling stocks off of its books."  Debra Aho Williamson, The Fairy Tale Ends; Interactive 100 Stumbles After Dot-Com Business Blows Away, Advertising Age, May 7, 2001, at S1.  InternetNews.com featured an article about the Seneca transaction on June 26, 2001, in which it stated that "[t]he merger comes out of a complicated effort by ad agency group Omnicom to lessen its losses in the interactive sector, by sharing its stakes in Agency.com and other I-shops with a private equity firm, Pegasus Partners."  Christopher Saunders, Seneca to Absorb Agency.com, InternetNews.com, June 26, 2001.  Later, on September 17, 2001, an article in Fortune stated that "[Omnicom's CEO John] Wren is just cleaning up the mess from his last big foray into untapped market terrain: the Internet," and that "Wren is now getting all the Net assets off Omnicom's books by shoveling them into a private holding company called Seneca."  Patricia Sellers, Rocking Through the Ad Recession: Omnicom Is Defying the Madison Avenue Slump Thanks to Its CEO's Aggressive, Contrarian Strategy, Fortune, Sept. 17, 2001, at 145.

[2]In May 2002, New Media Agencies reported that if Omnicom hadn't entered into the Seneca transaction, it "might have faced the prospect of having to accept sizeable write-offs in the value of its [internet] investments and, in the case of Agency.com, it would have had to deduct its share of the increasing losses from the profit that Omnicom would hope to report for 2001." How Omnicom Detached its Internet Ventures But Still Kept its Options Open, New Media Agencies Financial Intelligence, May 2002, at 2-1.

5

during audit committee meetings, and his request for advice regarding his responsibilities from a Columbia Business School professor. Appellant also relies on the fact that Callander resigned the same day that the board rejected his suggestion that the audit committee review Omnicom's proposal to reacquire two of the internet companies recently transferred to Seneca.

On June 6, 2002, Omnicom's stock price declined as rumors circulated that The Wall Street Journal would be publishing a negative article about accounting issues at Omnicom. That same day, Salomon Smith Barney issued a report noting "an article circulated on Briefing.com which speculated that The Wall Street Journal was set to break a potentially negative story about accounting issues at Omnicom." Joint App. at 1566. However, the report also expressed the belief that Callander resigned because his "relationship with other board members had become increasingly strained and counter-productive," noting that "[h]ad Mr. Callander complained about or disagreed with something in particular, Omnicom would have had to disclose it." Id. The next day, June 7, 2002, UBS Warburg published a report stating that "[w]e believe that [Callander's] resignation has more to do with 'fit' than actual auditing improprieties, but note that the director who headed the audit committee has given fuel to concerns with auditing irregularity." Id. at 1570.

On June 10, 2002, The Wall Street Journal published a short article in which it stated that Callander "quit the board after expressing concerns about the creation of an entity that houses

6

Omnicom's Internet assets," and, in particular, his "unhapp[iness] with Omnicom management's limited disclosure to the audit committee about the entity that holds many of Omnicom's former Internet assets." Vanessa O'Connell & Jesse Eisinger, Leading the News: Omnicom Director Quits Due to Entity Concerns, Wall St. J., June 10, 2002, at B4. The article further suggested that Callander left due to "some broader corporate governance concerns," but quoted Omnicom's Chairman as reassuring investors that "'there is no issue' with Seneca." Id.

Late on June 11, 2002, the Financial Times published an article describing Omnicom's investors' "post-Enron concerns about disclosure." Richard Tomkins & Christopher Grimes, Omnicom Shares Wobble Amid Disclosure Fears, Fin. Times, June 11, 2002. It acknowledged that "there is no suggestion of impropriety, still less any breaking of the rules," but noted that, nonetheless, industry executives and analysts were still concerned with Omnicom's methods of calculating organic growth. Id. The article also stated that investors were concerned with the Seneca transaction, which the article stated had been described as "a clever ploy" and "very skillful financial engineering," but the article stated that "there is no suggestion of impropriety or rule-breaking." Id.

On June 12, 2002, The Wall Street Journal published the rumored article on Omnicom that discussed Callander's resignation and the Seneca transaction. Vanessa O'Connell & Jesse Eisinger, Unadvertised Deals: At an Ad Giant, Nimble Financing Fuels Rapid

7

Growth -- But Omnicom's Web Stakes Spark Board Controversy; A Question of Disclosure -- The Impact of Acquisitions, Wall St. J., June 12, 2002, at A1. The article stated that Callander had "resigned amid questions about how the company handled a series of soured Internet investments," that "[h]e questioned whether something wasn't being disclosed to the board about the initial off-loading of the problematic investments and the proposal to buy two Internet firms," that "he had voiced doubts about Seneca's purpose for months," and that he had concerns that management "had engaged in transactions without running it through the board." Id. (internal quotation marks omitted). In further discussing the Seneca transaction, the article stated that it "allowed the company to avoid the possibility of writing down the value of its investments in some of the online firms." Id. It quoted Omnicom's CEO as saying that "Seneca was smart because instead of just walking away from these [Internet investments] and taking a write-off, we said we believe that Pegasus, through Seneca, could restructure the assets and make them valuable again." Id. (internal quotation marks omitted) (alteration in original).

The article also quoted Omnicom's general counsel, who stated that he had told Callander that the board had not approved Seneca. Id. This information was mistaken because "the still-unnamed venture wasn't called Seneca then, so the word hadn't shown up in automated searches of board minutes," even though the transaction had been approved. Id. (internal quotation marks

8

omitted).  Furthermore, the June 12 article referred to statements by two accounting professors, one who thought that Seneca "raises a red flag," and one who said, "[y]ou really have to wonder where this fair value is coming from in this environment, in this area."  Id. (internal quotation marks omitted).

The June 12 article also raised questions about Omnicom's general accounting practices.  For example, the article stated that "[i]n the wake of the collapse of Enron Corp., investors are demanding clearer and simpler financial statements from big companies, putting particular pressure on serial acquirers with tangled webs of deals."  Id.  It noted that Omnicom "uses a more aggressive means than its competitors to calculate the critical statistic of how much of its growth it generates from existing operations."  Id.  The article also claimed that "[t]he clash over Seneca [between Callander and management] signals new concern about the financial side of the Omnicom juggernaut."  Id.  In addition, it suggested that Omnicom may have a cash flow problem because "if cash spent on acquisitions is subtracted, the company has a negative cash flow," further noting that "Omnicom has sharply increased its borrowing lately."  Id.  Finally, the June 12 article discussed Omnicom's use of earn-out payments in its deal structures, stating that "[w]ith such a high volume of acquisitions, Omnicom's obligations to make future earn-out payments amount to a substantial potential liability . . . .

[that Omnicom does not] carry . . . on its balance sheet." Id.

Later that day, Omnicom held a telephone conference to reassure investors. During the conference, Omnicom's CEO stated that there was no dissent among the board members, but acknowledged that "Mr. Callander's reasons [for resigning from the board] were presented accurately as in 'The Journal' this morning."

A number of articles and analyst reports also responded to the June 12 article, some of which suggested that the article raised questions about Omnicom's accounting practices. For example, a Reuters article that day stated that Omnicom "was forced to play defense on Wednesday amid questions about its accounting," and suggested that Omnicom's management's credibility was harmed by the June 12 article. Adam Pasick, UPDATE 1-Omnicom Defends Accounting as Stock Plunges, Reuters, June 12, 2002. Nonetheless, the article also noted that "Omnicom said Callander's resignation was the result of a misunderstanding: that he was told, erroneously, that the board had not approved the creation of Seneca when it [sic] fact it had." Id. A New York Times article on June 13 also suggested that Omnicom "scrambled yesterday to repair damage caused by a newspaper article critical of its accounting practices." Stuart Elliott, Omnicom Shares Tumble 20%, N.Y. Times, June 13, 2002, at C11. Similarly, an analyst report from Lehman Brothers on June 13, 2002, stated that "[i]nvestors' concerns focus on whether or

10

not the assets should have been written down either at the time of the transaction or at the end of last year," yet it noted that "yesterday's Wall Street Journal article did not bring up any substantial 'new' issues." On June 21, 2002, a Campaign article stated that "[t]he questions now being asked are about whether the [Seneca] deal was entirely at arm's length, whether it was adequately disclosed and whether there might still be some lingering potential liabilities that might come back to haunt Omnicom in the future." Bob Willott, Omnicom Could Stand Test of WSJ Allegations, Campaign, June 21, 2002.

However, some analyst reports and news articles also indicated that the June 12 article did not raise any new factual issues and suggested that the market's negative reaction was due to the article's negative tone and innuendo in the post-Enron market. See, e.g., Merrill Lynch, FlashNote, Omnicom Group Inc.: Good News: No New News in WSJ Article, June 12, 2002; Richard Morgan, Hatchet Job, TheDeal.com, June 14, 2002; Bear Stearns, Omnicom Group (OMC-62.30) – Buy: Follow Up On WSJ Article, June 13, 2002; SalomonSmithBarney, Omnicom Group Inc. (OMC): Comments on Management Meeting, June 13, 2002; SalomonSmithBarney, Omnicom Group Inc. (OMC): Comments on WSJ Article, June 12, 2002; Richard Tomkins, Omnicom Slides on S&P's Move to Cut Outlook, Fin. Times, June 13, 2002; UBS Warburg, Global Equity Research: Omnicom Group (OMC), June 13, 2002.

In the two days following the June 12 article, Omnicom's

11

stock dropped over twenty-five percent relative to trading prices and activity in the market and the industry. However, after Omnicom announced that its new auditor, KPMG, reviewed the accounting for the Seneca transaction and had not recommended any changes, Omnicom's stock increased substantially relative to the industry and the market.

c) The Present Action

On June 13, 2002, as Omnicom's closing price fell, appellant and other plaintiffs filed this action. On May 19, 2003, appellant filed an amended complaint, which appellees moved to dismiss. The district court granted appellees' motion in part, dismissing claims involving Omnicom's organic growth calculations and its earn-out and put-out liabilities, but denied the motion with regard to the Seneca transaction.

The complaint made three allegations of fraud concerning the Seneca transaction. First, it alleged that Omnicom should have written down the value of the internet companies before engaging in the Seneca transaction. Second, it alleged that the accounting of the Seneca transaction was fraudulent because Omnicom failed to appropriately value the internet companies. Third, it alleged that Omnicom should have accounted for Seneca's losses after the Seneca transaction occurred because Omnicom controlled Seneca. Each allegation, therefore, focused on the loss in value of the internet companies and the failure to reflect that loss on Omnicom's books.

12

The class action complaint invoked the rebutable presumption of shareholder reliance established in <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 241-42 (1988).  It alleged that Omnicom was an actively traded company and that the market for its shares promptly reflected public information about the company.

In July 2005, appellant moved to certify a class "consisting of all persons and entities who purchased or otherwise acquired the securities of Omnicom from February 20, 2001 through June 11, 2002 and who were damaged thereby."  Appellant's Br. at 24.  The district court certified the class on April 30, 2007.

After extensive discovery and in response to appellees' motion for summary judgment, appellant proffered, <u>inter</u> <u>alia</u>, a report of its expert witness, Dr. Scott D. Hakala.  Dr. Hakala prepared an event study analysis and was prepared to testify that "the investing public's initial reactions to the partially corrective disclosures in June 2002 were tied to the news of Omnicom's inappropriate accounting for investments in Internet-related entities and not to other news during that time period."  Joint App. at 1221.  He claimed that "[i]nvestors legitimately feared that Omnicom's transfers of its Internet investments created the potential for losses and hidden liabilities and/or had allowed Omnicom to hide losses in the past."  Joint App. at 803.  Dr. Hakala also stated that:

> [T]he declines from June 5 to June 13, 2002, would not have occurred on those dates had Defendants not previously engaged in the fraudulent scheme alleged by Plaintiffs.  The

13

> information revealed in that time period constituted a partial revelation of information about this scheme.

Id. at 793-94 (internal citation omitted).

On January 29, 2008, the district court granted appellees' motion for summary judgment. See In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008). The district court, in a thorough and well-reasoned opinion, held that appellant had failed to proffer sufficient evidence that the fraud alleged -- the Seneca transaction -- caused the drop in stock price that damaged the class. We agree.

                              DISCUSSION

a) Standard of Review

"We review the grant of summary judgment de novo." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003). Summary judgment is only appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In looking at the record, we "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all inferences and resolv[e] all ambiguities in favor of the nonmoving party." Doro v. Sheet Metal Workers' Int'l Ass'n, 498 F.3d 152, 155 (2d Cir.

14

2007).  Nonetheless, summary judgment is appropriate where a defendant:

> has moved for summary judgment on the ground that undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element . . . .

Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992); see also Anderson, 477 U.S. at 248-49.

b) The Section 10(b) Claims

To sustain a claim under Section 10(b), appellant must show (i) a material misrepresentation or omission; (ii) scienter; (iii) "a connection with the purchase or sale of a security[;]" (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).  The district court granted summary judgment on the ground that appellant failed to proffer sufficient evidence to show loss causation.

Use of the term "loss causation" is occasionally confusing because it is often used to refer to three overlapping but somewhat different concepts.  It may be used to refer to whether the particular plaintiff or plaintiff class relied upon -- or is refutably presumed to have relied upon -- the misrepresentation. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d

15

Cir. 2007). Generally, however, courts use the term "transaction causation" to refer to this element. See, e.g., Dura Pharms., 544 U.S. at 341-42; Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) ("Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.").

"Loss causation" may also refer to the requirement that the wrong for which the action was brought is a but-for cause or cause-in-fact of the losses suffered, also a requirement for an actionable Section 10(b) claim. Dura Pharms., 544 U.S. at 342; see also 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). In short, plaintiffs must show "a sufficient connection between [the fraudulent conduct] and the losses suffered . . . ." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir. 2007).[3] This requirement exists because

_____

[3]Appellant argues that:

> It is not Lead Plaintiff's burden, on this motion, to show that the entire relative price drop in June 2002 was due to the fraud. Rather, summary judgment may be granted only if Defendants can prove as a matter of undisputed fact that none of the price drop could have resulted from the fraud.

Appellant's Br. at 42 (emphasis omitted). In doing so, it misstates the parties' burdens on summary judgment. Although "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying [the evidence] which it

16

private securities fraud actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura Pharms., 544 U.S. at 345.

A third concept sometimes referred to as "loss causation" relates to the question whether events that are a cause-in-fact of investor losses fall within the class of events from which Section 10(b) was intended to protect the particular plaintiffs and which the securities laws were intended to prevent. This issue, one of proximate cause, was the subject of extended (to say the least) discussion in three opinions in AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202 (2d Cir. 2000). Subsequently, we adopted the "zone of risk" test outlined in the dissenting opinion in AUSA. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172-75 (citing AUSA, 206 F.3d at 235, 238 (Winter, J., dissenting)).

To one degree or another, all three of these overlapping but somewhat differing issues are involved in the present matter.

With regard to reliance, appellant's complaint invokes the presumption of reliance based on the fraud-on-the-market theory

believes demonstrate the absence of a genuine issue of material fact," this does not relieve appellant of its burden of making "a showing sufficient to establish the existence of an element essential to [appellant's] case, and on which [appellant] will bear the burden of proof at trial." Celotex, 477 U.S. at 322. As a result, summary judgment is appropriate if appellant cannot show that at least some of the price drop was due to the fraud.

adopted in Basic.  485 U.S. at 241-42 (reliance of investors on misrepresentations is presumed where market for securities is open and developed).  The complaint alleges active trading by Omnicom in a "highly efficient and automated market," Omnicom's provision of information to the public through SEC filings and other means of disclosure, and scrutiny of available information by professional analysts who themselves communicate with the public.  Joint App. at 152.  It further alleges that "[a]s a result . . . the market for Omnicom's securities promptly digested current information regarding Omnicom from all publicly available sources and reflected such information in Omnicom's stock price."  Id. at 153.

Having sought to establish investor reliance by the fraud-on-the-market theory, appellant faces a difficult task.  The fraud alleged -- the Seneca transaction and failure to write down the value of the internet companies -- was the subject of continuing media reports beginning in May 2001.  See supra notes 1 & 2.  The stock price decline, which is the basis for the damages claim, occurred in June 2002.  In short, appellant must concede that the numerous public reports on the Seneca transaction were "promptly digested" by the market and "reflected . . . in Omnicom's stock price" in 2001 while seeking to recover for a stock price decline a year later in 2002.

Appellant seeks to do so through two means:  first, by claiming the existence of cause-in-fact on the ground that the

18

market reacted negatively to a corrective disclosure of the fraud, Lentell, 396 F.3d at 175; and, second, by arguing the existence of proximate cause on the ground that negative investor inferences drawn from Callander's resignation and from the news stories in June 2002 caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement. ATSI, 493 F.3d at 107 (2d Cir. 2007) (citing Lentell, 396 F.3d at 173). Establishing either theory as applicable would suffice to show loss causation.

1) Corrective Disclosure

A fraud regarding a company's financial condition in May 2001, if concealed, may cause investors' losses in June 2002 when disclosure of the fraud is made and the available public information regarding the company's financial condition is corrected. See Lentell, 396 F.3d at 175 n.4 (acknowledging that loss causation can be established by a "corrective disclosure to the market" that "reveal[s] . . . the falsity of prior recommendations"). Appellant argues that information disclosed to the market in June 2002, particularly by the June 12 article, constituted a partial corrective disclosure of the fraud and that the disclosure caused the market to respond negatively.

To reiterate, the June 12 article reported that Callander, a director and Chair of Omnicom's Audit Committee, had resigned amid questions he had raised for months regarding the purpose of the Seneca transaction. Callander was also reported to have

19

questioned whether the board had received full information about the initial Seneca transaction and about the new proposal to buy back two of the internet companies. The article also noted concerns, including those of accounting professors, about Omnicom's aggressive accounting strategy and about Omnicom's cash flow and increased borrowing. In opposing the motion for summary judgment, appellant offered the expert testimony of Dr. Hakala regarding causation issues.

However, none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint concerning the Seneca transaction. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40-41 (2d Cir. 2009) (holding that plaintiffs' evidence of news events and the expert's event study did not provide sufficient evidence of causation). The use of the Seneca transaction as an accounting method to remove losses from Omnicom's books was known to the market a year before Callander's resignation. See supra notes 1 & 2. There was no ambiguity in that regard in these articles.

All that the June 12 article stated was that Callander's resignation was due to general concerns over an aggressive accounting strategy, including perhaps Omnicom's year-old failure to write-down the value of the internet companies, and other matters concerning governance, in particular management's keeping the board informed. At best, from appellant's viewpoint, it has

20

shown that the market may have reacted as it did because of concerns that Callander's resignation and the negative tone of the June 12 article implied accounting or other problems in addition to the known Seneca transaction.

Appellant also relies on comments in the June 12 article by the two accounting professors to support a nexus between the fraud alleged and the June 2002 decline in share price. They argue that "a reasonable jury could conclude that the professor found Omnicom's accounting suspicious in light of Callander's resignation and Omnicom's decision to unwind Seneca, which were newly disclosed facts." Appellant's Br. at 55. However, the conclusory suspicions of the accounting professors and the unwinding of the Seneca transaction added nothing to the public's knowledge that the Seneca transaction was designed to remove losses from Omnicom's books.[4]

What appellant has shown is a negative characterization of already-public information. See Teacher's Ret. Sys. of La. v. Hunter, 477 F.3d 162, 187-88 (4th Cir. 2007) (negative characterization of previously known information cannot constitute a corrective disclosure); In re Merck & Co. Sec. Litig., 432 F.3d 261, 269-70 (3d Cir. 2005) (same). A negative

_____

[4]Appellant also relies on the fact that Omnicom's stock price recovered after Omnicom announced that KPMG had reviewed its accounting of the Seneca transaction and did not recommend any changes. Appellant's Br. at 52-53. However, KPMG's conclusion that there was no fraud in the Seneca transaction hardly supports a finding that fraud in the Seneca transaction caused a loss.

21

journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions. After all, no hard fact in the June 12 article suggested that the avoidance of the write-down was improper.

Dr. Hakala's study does not alter our conclusion. It is true that "[w]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 79 (2d Cir. 2002) (internal quotation marks omitted). However, summary judgment is not per se precluded because there are conflicting experts. See Raskin v. Wyatt Co., 125 F.3d 55, 65 (2d Cir. 1997) ("As we read the opinion, [the district court] concluded that the [expert's] report was probative of no material fact, from which we deduce that it was, in [the district court's] view, irrelevant and inadmissible. We therefore can review this ruling as evidentiary in character . . . .") (citations omitted). Although the reports must be construed in the non-moving party's favor, "if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to direct a verdict or grant summary judgment for defendant." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002); see also Raskin, 125 F.3d at 66 ("[A]n expert's report is not a talisman against summary judgment.").

Summary judgment is appropriate here because Dr. Hakala's

22

testimony does not suffice to draw the requisite causal connection between the information in the June 12 article and the fraud alleged in the complaint. His event study merely "links the decline in the value of [the company's] stock to various events." Flag Telecom, 574 F.3d at 41.

If Dr. Hakala is opining that Omnicom's stock dropped because investors first became aware in June 2002 of the fraud alleged in the complaint, that opinion is, as a matter of law, unsustainable on this record. It runs squarely into the undisputed fact that the internet company losses and the failure to write them down was known in May 2001 and into appellant's allegation that the market for Omnicom's securities at all times promptly digested and reflected in its share price all public information.[5] If he is opining that Omnicom's stock dropped because the fraud in May 2001 caused the negative press of June 2002 attending Callander's resignation, then his testimony is irrelevant because these events were not proximately caused by the fraud alleged, for reasons discussed immediately below. The

---

[5]Appellant is mistaken to compare this to our cases in Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001), Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000), and Mfrs. Hanover Trust v. Drysdale Sec. Corp., 801 F.2d 13 (2d Cir. 1986). Those cases are factually distinguishable because in each case the plaintiffs demonstrated a specific causal connection between the loss and the alleged fraud. See Suez Equity, 250 F.3d at 96-97 (facts omitted from executive's background report would have indicated executive's inability to run company and forecast company's eventual liquidity problems); Rothman, 220 F.3d at 87, 89, 95 (company's misleading accounting of royalty expenses caused later losses when market became aware that a massive write-down was imminent); Mfrs. Hanover, 801 F.2d at 16-17, 19, 21-22 (defendant accounting firm's misrepresentations as to company's solvency induced plaintiff to do business with the company which ultimately led to the plaintiff's loss).

23

remainder of his report establishes only that, as previously noted, the June 12 article raised questions about potential accounting concerns, including the Seneca transaction.

Because appellant failed to demonstrate any new information in the June 12 article regarding Omnicom's alleged fraud, appellant has failed to show a price decline due to a corrective disclosure.

2) The Materialization of the Risk Theory

Appellant argues that, even if no new financial facts were revealed in June 2002, Callander's resignation and the ensuing negative media attention were foreseeable risks of the fraudulent Seneca transaction and caused the temporary share price decline in June 2002. The losses suffered by the class are, the argument goes, due to the materialization of that risk.

As noted, plaintiffs can prove loss causation by showing "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." ATSI, 493 F.3d at 107. A misrepresentation is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations . . . ." Lentell, 396 F.3d at 173. Because Omnicom's internet company losses were publicly known, the matter concealed must be the invalidity of Omnicom's accounting for those losses in the Seneca transaction.

24

The zone of risk is determined by the purposes of the securities laws, i.e., "to make sure that buyers of securities get what they think they are getting." Chem. Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984). In this context, therefore, recovery is limited to only the foreseeable losses "for which the intent of the laws is served by recovery." AUSA, 206 F.3d at 234 (Winter, J., dissenting).

Fraud may lead to a director's resignation -- to escape personal liability, if for no other reason, see, e.g., 15 U.S.C. § 77k(b)(1) (providing exemption from civil liability for director who resigns before effective date of fraudulent registration statement) -- and to negative stories by the media. In such circumstances, it is generally the facts underlying the fraud and resignation that causes a compensable investor's loss. In the present case, as noted, the facts were known a year before the resignation, and the resignation did not add to the public knowledge any new material fact about the Seneca transaction. The essence of the claim is that Callander's resignation concerned the Seneca transaction and that the resultant negative publicity suggesting possible accounting malfeasance may lead to recovery for a temporary drop in share price.

To be sure, the record shows that Callander was concerned over general accounting practices and governance problems. In that regard, he was concerned about the Seneca transaction, but he had also been mistakenly informed that the Board had never

25

approved it.  On the present record, appellant has at best shown that Callander's resignation and resulting negative press stirred investors' concerns that other unknown problems were lurking in Omnicom's past.  Indeed, there is no allegation that investors were ever told that improper accounting had in fact occurred with regard to the Seneca transaction, either in the June 2002 stories or later.

The generalized investor reaction of concern causing a temporary share price decline in June 2002, is far too tenuously connected -- indeed, by a metaphoric thread -- to the Seneca transaction to support liability.  The securities laws require disclosure that is adequate to allow investors to make judgments about a company's intrinsic value.  Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press or even by directors.  To hold otherwise would expose companies and their shareholders to potentially expansive liabilities for events later alleged to be frauds, the facts of which were known to the investing public at the time but did not affect share price, and thus did no damage at that time to investors.  A rule of liability leading to such losses would undermine the very investor confidence that the securities laws were intended to support.

CONCLUSION

Appellant has failed to raise a material issue of fact that

26

would support a finding of loss causation, and, as a result, the district court properly granted defendants' summary judgment motion.[6]  For the foregoing reasons, we affirm.

---

[6]Plaintiffs also rely on Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.  However, in order to establish control person liability, appellant must first establish a primary violation.  See ATSI, 493 F.3d at 108.  Because appellant fails to establish a primary violation, the district court properly granted defendants' summary judgment motion on the Section 20(a) claims.